**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| WEST PALM BEACH FIREFIGHTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SPECTRUM BRANDS LEGACY, INC. f/k/a SPECTRUM BRANDS HOLDINGS, INC., ANDREAS R. ROUVÉ, DAVID M. MAURA, and DOUGLAS L. MARTIN,<br><br>Defendants. | Case No.: 19-cv-347<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff West Palm Beach Firefighters' Pension Fund ("Plaintiff") brings this securities class action on behalf of all investors who purchased or otherwise acquired the securities of Spectrum Brands Legacy, Inc. f/k/a Spectrum Brands Holdings, Inc. ("Spectrum" or the "Company") between June 14, 2016 and November 16, 2018, inclusive (the "Class Period"). Plaintiff asserts violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78j(b)), and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission (the "SEC") (17 C.F.R. § 240.10b-5), against Spectrum, its former CEO Andreas R. Rouvé, its current CEO David M. Maura, and its current CFO Douglas L. Martin (together, Defendants"). Plaintiff also asserts violations of Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)) against Rouvé, Maura, and Martin (together, the "Individual Defendants").

Plaintiff alleges the following based upon personal knowledge as to its own acts, and information and belief as to all others. Plaintiff's information and belief is based upon an ongoing independent investigation by Plaintiff's undersigned counsel, which includes, among other things, review and analyses of: (i) SEC filings made by the Company; (ii) public statements issued by the

Company, including press releases, earnings call transcripts, industry conference transcripts, and slide decks; (iii) securities analyst reports about the Company and its industry; and (iv) media reports about the Company.

Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within Defendants' custody or control. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. Spectrum is a Wisconsin-based company. Its primary business is manufacturing and marketing consumer products, which it then distributes largely to "big-box" retailers like Home Depot. During the Class Period, Spectrum owned the trademarks or held licenses for well-known household brands like Armor All, Kwikset, and Black & Decker. Spectrum was organized into five divisions, of which two – Global Auto Care ("GAC") and Home & Hardware Improvement ("HHI") – are relevant here.

2. Spectrum relied heavily on its "distribution centers" – physical plants where Spectrum manufactured, packaged, and/or distributed its products.

3. On June 14, 2016 and February 3, 2017, Spectrum announced that it was consolidating the operations of its GAC and HHI businesses into two brand-new distribution centers in Dayton, Ohio and Edgerton, Kansas, respectively (the "Consolidations"). These were time- and capital-intensive projects on which analysts and other market-watchers commented extensively. Once operational, the Dayton and Edgerton facilities would impact every aspect of the GAC and HHI businesses.

4. From June 2016 through April 2018, Spectrum and its senior management gave real-time updates about the status of the Consolidations that presented the Company's execution as unreservedly positive and effective. For example, Rouvé and Martin routinely described the "good progress," asserted that the Consolidations were "on track" to "reduce expenses and inventory in the back half of 2017 and in 2018," and characterized any problems faced as "temporary," "transitional," "short-term," and "quickly addressed."

5. In late 2017, Spectrum announced that the GAC project was complete and that the HHI project was nearing completion. Rouvé told the market that the operational improvements were already manifest, saying in a November 11, 2017 press release that Spectrum had "delivered strong continuous improvement savings along with major efficiency enhancement programs in GAC and HHI." On February 8, 2018, Rouvé reiterated that the GAC consolidation was complete, which "[wa]s important as we head into the peak spring and summer period."[1]

6. These statements were materially misleading, falsely conveying to the market that the new facilities were already improving the cost profile and ready, willing, and able to execute on Spectrum's seasonal spring and summer demand.

7. In truth, the execution of the Consolidations had been flawed and the Company knew those projects were far from complete. On April 26, 2018, the Company announced poor earnings for the second quarter of 2018 and revised its full-year 2018 EBITDA guidance downward by about 9%.[2] Spectrum also announced that it had fired Rouvé as CEO and replaced him with Maura, then Chairman of the Board of Directors. The Company admitted that its disastrous quarter was largely driven by bad execution on the consolidation projects, even though

[1] Unless otherwise indicated, any emphasis or alterations to quotations are added.

[2] Spectrum's fiscal years end on September 30, resulting in off-cycle earnings announcements.

Rouvé and Martin had assured the market that the projects were completed effectively as recently as two months earlier. As a result, Spectrum's share price declined by about 22.1%.

8. Despite acknowledging problems with the Consolidations, Defendants continued to falsely assure investors that those problems had been resolved. During the second quarter 2018 earnings call, and the subsequent third quarter earnings call on July 26, 2018, Maura and Martin represented that the problems at the distribution centers were "largely behind" the Company.

9. Then, on November 19, 2018, Spectrum surprised the market by announcing a $92.5 million goodwill write down on the GAC business. Maura said that this was necessary to clean up the inventory and balance sheet mess caused by the poorly executed Consolidations. In other words, the November 2018 write down constituted additional economic harm to the Company stemming from the inadequately performed consolidation projects. After the April 2018 disclosures, Spectrum should have disclosed to investors that the problems related to the Consolidations had not been resolved and that the Company's bottom line would continue to suffer, instead of falsely insisting that the worst was over. Because of the November 2018 write down and related disclosures regarding the Consolidations, Spectrum's share price declined by another 19%.

10. Through this Action, Plaintiff seeks an award of damages to compensate Spectrum stockholders for the Defendants' misrepresentations set forth herein.

## JURISDICTION AND VENUE

11. This action asserts federal securities violations pursuant to the Exchange Act and rules promulgated thereunder. Thus, this Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa. In addition, because this is

a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

12. This Court has personal jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa), as Spectrum conducts business and is headquartered in this District. Many of the acts and transactions that constitute violations of law complained of herein, including the preparation and/or dissemination to the public of untrue statements of material facts and statements that omitted material facts necessary to make the statement not misleading, occurred in this District.

14. In connection with the acts, conduct, and wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

15. Plaintiff West Palm Beach Firefighters' Pension Fund is a pension fund based in West Palm Beach, Florida that provides retirement benefits for firefighters. As of June 30, 2018, Plaintiff managed total assets in excess of $215 million on behalf of over 400 current employees, retirees, and beneficiaries. Plaintiff purchased Spectrum securities on the New York Stock Exchange ("NYSE") during the Class Period and, as a result, was damaged by Defendants'

misrepresentations. Plaintiff's certification, attached as Exhibit A, evidences its transactions in Spectrum securities.

16. Spectrum is a Delaware corporation with its principal executive offices located at 3001 Deming Way, Middleton, Wisconsin 53562. Spectrum is a diversified global branded consumer products company. It manufactures, markets, and distributes a variety of products in approximately 160 countries. Spectrum's GAC segment sells products designed to enhance car appearance and performance – like Armor All wipes, cleaners, and care products, or STP fuel and oil additives. HHI sells home hardware and fixture brands – like Kwikset door knobs locks, and deadbolts, or Pfister kitchen and bathroom faucets and accessories. For the fiscal year ended September 30, 2017, GAC and HHI together generated over 42% of Spectrum's adjusted EBITDA. At all relevant times, Spectrum's common stock traded on the NYSE under the ticker symbol "SPB."[3]

17. Andreas R. Rouvé joined Spectrum in 2002 and was promoted to CEO in April 2015. Rouvé was CEO for most of the Class Period, up until April 26, 2018 when he "resigned" following terrible second quarter 2018 financial results stemming from the poorly executed Consolidations. Rouvé routinely spoke on behalf of the Company in press releases, earnings calls, and at conferences. During the Class Period, he commented regularly on the Company's supposedly positive progress in consolidating the GAC and HHI facilities.

18. David M. Maura joined Spectrum's Board as interim Chairman in June 2010. He was named permanent Chairman in July 2011 and Executive Chairman in January 2016. On April

[3] On July 13, 2018, Spectrum was acquired by its former controlling stockholder, HRG Group, Inc. ("HRG"), in a stock-for-stock merger. "Legacy" Spectrum became a wholly owned subsidiary of HRG, which was a holding company without its own operations. HRG was renamed Spectrum Brands Holdings, Inc., and began trading under "old" Spectrum's ticker of SPB.

26, 2018, he replaced Rouvé and immediately downplayed the potential for further fallout from the flawed Consolidations. Maura routinely spoke on behalf of the Company in press releases, earnings calls, and at conferences.

19. Douglas L. Martin joined the Company in 2014 as its CFO. He was CFO throughout the Class Period and to this day. Martin routinely spoke on behalf of the Company in press releases, earnings calls, and at conferences. During the Class Period, he commented regularly on the Company's supposedly positive progress in consolidating the GAC and HHI facilities.

## SUBSTANTIVE ALLEGATIONS

### I. Defendants' Material Misstatements and Omissions During the Class Period

20. The Class Period began on June 14, 2016, when Spectrum announced the construction of a brand-new, $33-million GAC facility in Dayton, Ohio. Ken Burns – GAC's vice president of supply chain and later Dayton plant manager – told the local press that "[t]his facility will improve [GAC's] speed and efficiency while providing us room for further growth." The Company also highlighted the purported strategic benefits of consolidating GAC distribution in Dayton, referencing its proximity to the interchange of the critical Interstate 70 and 75 shipping arteries.

21. During Spectrum's third quarter 2016 earnings call on July 28, 2016, Martin provided a timeline for completion of the Dayton facility ("[o]pening in early 2017") and asserted that "[t]he site will also serve as [GAC]'s global research and development center. With more than half the country's population within 600 miles . . . this consolidation will bring cost efficiencies and simplify GAC's US footprint." Specifically, Spectrum planned to close three

facilities in Painesville Ohio, Mentor, Ohio, and Garland, Texas and bring their operations to Dayton.

22. On January 26, 2017, Spectrum announced its first quarter 2017 financial and operating results. In the press release attached as Exhibit 99.1 to a Form 8-K filed with the SEC, Rouvé touted the Company's ability to execute on operational efficiency projects, stating "[w]e are seeing . . . our continuous improvement of processes and strong cost reduction results in our plants and supply chains . . . . We continue to expect top-line growth above category rates, strong bottom-line growth and a free cash flow increase of up to 10 percent in fiscal 2017, driven by the continuous launch of innovation and further leveraging of our global platform to expand distribution of our products."

23. During the earnings call on January 27, 2017 to discuss the first quarter 2017 results, Rouvé highlighted the "***good progress***" on the GAC consolidation, describing it as a "major simplification of [GAC's] US production, distribution and R&D footprint by consolidating in Dayton, Ohio . . . . We expect to complete this project within the fiscal year."

24. On February 3, 2017, Spectrum put out its press release formally announcing its second major consolidation project: the consolidation of the HHI facilities into a new plant in Edgerton, Kansas. Spectrum would close its East and West Coast distribution centers, in Charlotte, North Carolina and Mira Loma, California, respectively, and bring their operations to Edgerton. Phil Szuba, Senior Vice President and General Manager of HHI, said in a press release that "we determined that centralizing distribution operations in Edgerton will enable [HHI] to more efficiently serve our customers with lower inventory levels while establishing a platform for future growth."

25. A few days earlier, during the January 27, 2017 earnings call, Rouvé had previewed the HHI consolidation, asserting that it would be completed by "the end of calendar year 2017," and would "improve working capital and customer service by providing additional capacity for growth."

26. On May 2, 2017, Spectrum announced its second quarter 2017 financial and operational results. During the earnings call that day, Rouvé again highlighted the supposedly effective execution of the Consolidations, stating: "[W]e are making good progress with our continued improvement initiatives . . . . Both the consolidation of [GAC] in Dayton, Ohio and the consolidation of our [HHI] distribution center in Kansas are on track and will help us reduce expenses and inventory in the back half of 2017 and in 2018." Similarly, Martin said that the HHI and GAC consolidations "are going well. And those will contribute a little bit this year, but those will, from a working capital and cost savings perspective, fully flow into next year," *i.e.*, 2018.

27. On July 27, 2017, Spectrum announced its third quarter 2017 financial and operational results, disclosing year-over-year net income decline compared to the third quarter of 2016. The Company blamed most of the shortfall on a "confluence of factors, some macro and others Company-specific," but admitted it was caused in part by execution issues in the GAC and HHI Consolidations. Spectrum immediately, however, downplayed the magnitude of the problems at those facilities and told the market that there was nothing to worry about.

28. Specifically, Rouvé said in the press release attached as Exhibit 99.1 to a Form 8-K filed with the SEC that: "[W]e experienced ***temporary, transitional*** supply chain challenges with our HHI U.S. distribution center consolidation in Kansas and the GAC U.S. operating consolidation in Ohio that affected shipping levels in the ***short term*** and impacted sales by approximately $24 million . . . . However, both projects remain ***on schedule and the issues are***

***being quickly addressed*** . . . . Despite the start-up challenges, these major consolidation projects will bring a number of important productivity, efficiency, and other benefits, including reduced operating costs, lower working capital and even better service to our customers."

29. Similarly, during the earnings call that day, Rouvé said: "We are in the middle of 2 major transformational projects, which will allow us to operate much more efficiently . . . by consolidating our entire U.S. [HHI] distribution in Kansas and our [GAC] manufacturing and distribution in Ohio. Both facilities are up and running. However, in the transition from the old to the new facilities, we did experience ***temporary supply chain challenges***, which impacted our sales in the third quarter by about $24 million or 1.8%. Both projects remain on schedule, and we are making good progress in clearing the much higher than usual order book in our fourth quarter."

30. For his part, Martin said the following during the July 27, 2017 earnings call: "Temporary shipping start up issues at GAC's new Dayton facility also impacted Q3 results . . . . Overall, the Dayton facility consolidation is on schedule and will deliver meaningful cost savings and improved working capital in fiscal 2018 . . . . [GAC is] really up and running from a production perspective, . . . things are running really well there . . . . [Distribution] is functioning better and better every day, ***I would say, it's about 98% right now***. So it's in a good shape. And while we haven't disclosed specifically what the cost savings are, it is a better than 3-year payback and also has a significant inventory reduction benefit associated with it. So it's a very attractive pro[ject] despite the fact that, it's had a [bit of a] negative impact on our quarter."

31. On November 16, 2017, Spectrum announced its fourth quarter 2017 financial and operating results. In the SEC-filed press release, Rouvé was back to highlighting the Company's supposed effectiveness in delivering operational improvements in general, and at Dayton and Edgerton in particular, stating: "We finished a challenging fiscal 2017 with a strong fourth

quarter performance . . . . We . . . delivered strong continuous improvement savings along with major efficiency enhancement programs in GAC and HHI that will bring important future benefits . . . . We plan to further improve the efficiency of our processes."

32. During the earnings call that same day, Rouvé again represented that "[w]e are also making good progress in our 2 transformational projects in the U.S. The consolidation of our [GAC] manufacturing and distribution in Dayton, Ohio is ***now complete***, and the consolidation of [HHI] distribution in Kansas is currently 65% complete, and we expect to complete this project in March 2018. Both projects streamline our supply chain and will allow us to reduce our inventory levels and improve our service levels."

33. Martin also again downplayed the potential for further problems, stating: "Operationally, HHI continues to complete its U.S. distribution center consolidation into a single, new larger facility in Kansas. The project began in April and has experienced some operating startup issues, cost inefficiencies and higher-than-normal customer backlog, but we've now closed the West Coast distribution center successfully, and the East Coast facility will wind down soon. This consolidation will result in a more streamlined footprint and lower inventories later in 2018 and beyond."

34. Finally, on February 8, 2018, Spectrum announced its first quarter 2018 financial and operational results. In the SEC-filed press release, Rouvé declared that "[o]ur GAC U.S. footprint consolidation is now complete, which is important as we head into the peak spring and summer period. Also, our HHI distribution consolidation in Kansas is moving toward completion in February, and our European project to consolidate Pet distribution centers will be completed in early April. These projects will bring cost savings, lower working capital and improved service levels later this year and beyond." Highlighting that the Consolidations were supposedly under

control moving into the spring and summer was a critical data point for the market. Spectrum's business – including GAC and HHI – is seasonal, with its heavy reliance on products used outdoors.

35. In the press release, Rouvé also reaffirmed Spectrum's 2018 guidance and stated that he "expect[ed] stronger performances in [Spectrum's] continuing operations in the out quarters."

36. The statements described in paragraphs 20 through 35 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.

37. Specifically, Defendants misrepresented or failed to disclose that Spectrum was facing serious operational problems in the Consolidations; that these problems would significantly impact production, shipping levels, and sales, and by extension, the Company's profit margin; and that as a result the stockholders would suffer harm. Defendants also represented that the GAC and HHI facilities were in a good position to handle the cyclical uptick in Spectrum's business starting in the spring. Spectrum, Rouvé, and Martin understood – or recklessly ignored – that the Dayton and Edgerton facilities were not adequately prepared to promptly and effectively handle GAC's and HHI's orders, particularly as the busy season ramped up.

## II. The Truth Begins to Emerge

38. On April 26, 2018 – just two and a half months after assuring the market that the GAC Consolidation had been completed successfully and the HHI project was proceeding effectively – Spectrum disclosed its second quarter 2018 financial and operational results, disclosing some of the impact that resulted from the mishandled projects.

39. Per its SEC-filed press release, Spectrum lowered its 2018 adjusted EBITDA guidance by $57 million (about 9%), from a range of $657 to $674 million to a range of $600 to $617 million. At the midpoint, this represented a projected decline of $30.5 million year-over-year compared to 2017's actual adjusted EBITDA of $639 million. Based on the assessment of Deutsche Bank's analyst, Spectrum missed its second quarter 2018 expected EBITDA by $40 million. (Spectrum only provided annual guidance, so analysts made quarterly estimates themselves).

40. Rouvé stepped down "effective immediately" and was replaced as CEO by Executive Chairman David Maura.

41. There is no doubt that the unacceptable quarterly results stemmed from the poorly executed Consolidations. Maura admitted that "[t]he challenges, which you see in the numbers this morning, relate to our HHI and GAC consolidation projects . . . . This quarter and our lowering of our 2018 guidance are major disappointments for every one of us." Martin also conceded that "[t]he biggest drivers" of the EBITDA decline "were the major manufacturing and distribution center operations inefficiencies from HHI and [GAC]."

42. In the press release, Maura conceded that Spectrum's new facilities were woefully unprepared for the busy season, contrary to the Company's statements in February, stating that "[t]he challenges related to our two greenfield manufacturing and distribution projects were meaningfully greater than we expected. As we brought our East Coast distribution center into our new [HHI] facility in Edgerton, Kansas at the end of February, we experienced facility-wide disruptions which hampered distribution capabilities materially in March . . . . Our [GAC] facility

in Dayton struggled at higher production levels in March, which led to significant inefficiencies and shipping challenges."[4]

43. The Company also disclosed that "[g]iven these issues, sales of about $30 million from in-house orders could not be shipped by quarter-end due to higher customer order backlogs at our HHI and GAC facilities, and we are working to return them to normal efficiency levels." In other words, the distribution centers were unable to manufacture, package, and ship product at the necessary standards and on the necessary timeline. The EBITDA declines at GAC and HHI were largely driven by double-digit margin erosion, as Spectrum was forced to write off inventory and give rebates to unhappy customers who were not receiving quality product, on time.

44. In response to this news, Spectrum stock declined from $93.14 per share to $72.56 per share (about 22.1%).

## III. <u>Additional Misstatements</u>

45. The Company assured investors that the problems at these facilities were largely resolved and that the Consolidation projects were poised to deliver positive results. In the second quarter 2018 press release, Maura said: "It is our firm belief that the current impact to our free cash flow is mostly transitory and largely reflects one-time investments in working capital and customer relationships. The fact is our recovery is already under way, and full recovery will take place gradually over the next several quarters."

46. Similarly, in the earnings call that same day, Martin said "[w]e believe the HHI and GAC operating inefficiencies are ***transitory in nature*** . . . and the adverse margin impact ***is largely behind us*** . . . . Looking at the second half, we are optimistic about delivering an increase – a

[4] In project design, "greenfield" refers to a new physical plant constructed on unused land and thus not subject to use constraints imposed by existing structures or other limitations.

significant increase in net sales and adjusted EBITDA . . . . Given the recent actions to improve operational efficiency that David mentioned, we are confident that customer order backlogs at HHI and [GAC] will continue to come down as the facilities improve their on-time shipments, which we expect will create a tailwind for these businesses during the more peak demand times of their year." Maura said that the Company took "swift and decisive actions," "we are working to return [backlog] to normal efficiency levels," and that "this hit this quarter is transitory."

47. Analysts were concerned. As Oppenheimer wrote, "[t]hese ramp-up issues should have been fixed quarters ago and, we believe, is the reason Andreas Rouvé was replaced." Spectrum assuaged those concerns. In response to analyst questions regarding Consolidations, was firm in his assertion that recovery and material improvements were well underway.

48. In analyst reports following the earnings call, at least two analysts (BMO and Deutsche Bank) noted that conversations with management had convinced them that the problems related to the Consolidations were "transitory," and not structural.

49. When Spectrum announced its third quarter 2018 earnings on July 26, 2018, and revealed no negative news about the Consolidations, Defendants again took the opportunity to assert that the problems were fixed. Maura said in the press release that "the business is rebounding, proving the issues we faced were indeed largely transitory." During the call Maura also assured investors that "customer order backlogs were markedly reduced . . . which confirms that our new approach to culture and our new efficiency measures are taking hold and are working." Analysts again credited management's statements, with Oppenheimer writing "[o]verall, it appears new CEO David Maura has put the company's self-inflicted wounds in the rear-view mirror."

50. The statements described in paragraphs 45 through 49 above were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants misrepresented or failed to disclose the full scope of the economic harm flowing from the botched Consolidations – particularly that a nearly nine-figure impairment was needed to clean up backlogged inventory.

## IV. The Full Truth Emerges

51. On November 19, 2018, Spectrum announced another disappointing quarter caused by the flawed consolidation projects. Specifically, in its SEC-filed press release, Spectrum disclosed that it had an operating ***loss*** of $78.8 million in the fourth quarter of 2018 (compared to $45.8 million in operating income in the fourth quarter of 2017), "primarily as a result of [a ***$92.5 million***] write-off from impairment of goodwill in [GAC]." This translated to a negative operating margin of 10% compared to a margin of 5.8% the prior year. The Company also announced $98.5 million in restructuring charges in 2018, compared to $44.3 million the prior year "primarily [as] the result of operating inefficiencies in the HHI Kansas and [GAC] Dayton consolidation projects."

52. Maura acknowledged that taking the write down was necessary to rectify problems caused by the poor consolidation in the GAC division: "in our [GAC] division, we wrote off and liquidated excess and obsolete inventory to clean up the balance sheet of that division." In other words, the Company had to write down inventory that it could not sell or ship due to the poorly executed GAC consolidation, which the Company told investors had been successfully completed months earlier.

53. Analysts immediately questioned why the underlying problems that ultimately necessitated the write down were not disclosed to investors previously. During the call, a Bank of America Merrill Lynch analyst asked "[i]n the second quarter, you'd had some challenges in Kansas and Dayton and then it sounded like a lot of those have been improved into the third quarter . . . . [W]hat happened between the third and fourth quarter that reverted some of the challenges." Similarly, Deutsche Bank's analyst said "[m]aybe if you could give us just your view on what changed from 3 months ago or when you last reported? Because it seems like a lot of the factors that you've talked about today, we knew about." In response, Maura essentially reiterated that the impairment was a one-time clean up issue, without explaining why it had not been recognized or disclosed earlier.

54. The analysts were even more critical in their reports. Wells Fargo wrote "[w]e are concerned that some of the transitory issues that have negatively impacted recent results . . . are becoming part of [Spectrum]'s normal operating cadence." Deutsche Bank wrote that "[w]e were hopeful last quarter that the company had finally overcome its many issues – which we previously viewed as 'transitory.' However, at this point, given a lack of visibility and continuing 'one-time' issues, it is apparent that there are underlying structural issues . . . . [O]ur questions/concerns from here are centered around the following: Internal processes/control and management's ability to forecast the business, noting an EBITDA miss of over $100m or -16% this year."

55. The news of the write down caused Spectrum's stock price to decline another 19% (from $59.35 per share to $48.05 per share).

56. In the aftermath of the write down, the Company finally admitted that the Consolidations had been deeply flawed for a long time. On November 19, 2018, Maura admitted that "in 2018, look, the company got off track operationally, it took on too many internal

consolidation projects at the same time that didn't go the right way . . . . The 5 to 1 [GAC] consolidation caused us a lot of headaches, but it's 75% or more completed and fixed" – an incredible concession considering Martin said the GAC consolidation was ***98%*** of where it needed to be as early as ***July 2017***, and Defendants repeatedly stated starting in November 2017 that the GAC consolidation was complete.

57. Similarly, expanding in his explanation in March 8, 2019, Maura told analysts that "[w]e had 2 big missteps last year that hurt customer service. Customer service is job 1, you got to ship in time, on time, in full. We're going to do that this year . . . . [W]e did an internal 5-to-1 consolidation and really mucked it up. We spent a good part of fiscal '18 fixing it . . . . I think we have a lot of credibility issues given '18. April of '18."

**LOSS CAUSATION AND ECONOMIC LOSS**

58. As detailed above, Defendants made material misstatements and omissions during the Class Period and engaged in a scheme to deceive the market. These misrepresentations artificially inflated the price of Spectrum securities and operated as a fraud or deceit on the Class. On April 26 and November 19, 2018, the true state of the Consolidations and their impact on Spectrum's financial results were disclosed, uncovering Defendants' prior misrepresentations and fraudulent conduct. As a result, the price of Spectrum securities fell precipitously, as the prior artificial inflation came out of the share price.

59. Because Plaintiff and other members of the Class purchased Spectrum securities at inflated prices during the Class Period, they suffered economic loss – *i.e.*, damages under the federal securities laws. Defendants' material misstatements and omissions directly or proximately caused the damages suffered by the Plaintiff and other Class members. Plaintiff and other Class members experienced economic loss as a direct result of Defendants' fraudulent scheme to

artificially inflate the Company's stock price, and the subsequent significant decline in the value of the Company's share price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

60. The timing and magnitude of the Spectrum stock price declines negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

**SCIENTER ALLEGATIONS IN SUPPORT OF EXCHANGE ACT VIOLATIONS**

61. As alleged herein, Defendants acted with scienter in that they knew that the public statements and documents issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth above in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Spectrum, their control over, and/or receipt and/or modification of Spectrum's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Spectrum, participated in the fraudulent scheme alleged herein.

**PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET**

62. At all relevant times, the market for Spectrum securities was an efficient market for the following reasons, among others:

a. Spectrum securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

b. During the Class Period, Spectrum securities were, in fact, actively traded, demonstrating a strong presumption of an efficient market;

c. As a regulated issuer, Spectrum filed periodic public reports with the SEC and NYSE during the Class Period;

d. Spectrum regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, conference calls with financial analysts, and similar reporting services; and

e. Spectrum was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period, each of which reports were publicly available and entered the public marketplace.

63. Because of the foregoing, the market for Spectrum securities promptly digested current information regarding Spectrum from all available sources and reflected such information in the price for Spectrum securities during the Class Period. Under these circumstances, all purchasers of Spectrum common stock during the Class Period suffered similar injury through their purchase of Spectrum's common stock at artificially inflated prices and a presumption of reliance applies.

64. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense

that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the omitted facts about the true status of the Consolidations were withheld and material, as an investor would have considered them in deciding whether to purchase and/or sell Spectrum stock.

**NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE**

65. The statutory safe harbor provided for "forward-looking statements" under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

66. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as forward-looking statements when made and/or there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

67. Defendants are also liable for any false or misleading forward-looking statements pled because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Spectrum who knew that the forward-looking statement was false.

68. None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or

forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

69. Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired Spectrum common stock on the public market during the Class Period and were damaged (the "Class"). Excluded from the Class are the Company; its directors and officers; the Individual Defendants; any of their respective legal representatives, heirs, successors or assigns; and any entity in which any of the Defendants have or had a controlling interest.

70. The members of the Class are so numerous that joinder of all members is highly impracticable. Throughout the Class Period, Spectrum securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time, it can be ascertained through appropriate discovery. Record owners and other members of the Class may be identified from records maintained by Spectrum or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice like that customarily used in securities class actions. Upon information and belief, as of September 30, 2017, Spectrum had more than 40,640,422 shares of common stock outstanding. Upon information and belief, these shares are held by thousands of individuals located geographically throughout the country and possibly the world.

71. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

72. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether Defendants violated the federal securities laws through their respective acts as alleged herein;

b. whether Defendants misrepresented and/or omitted material facts;

c. whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d. whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

e. whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

f. whether the price of Spectrum securities during the Class Period was artificially inflated because of Defendants' conduct complained of herein;

g. whether Defendants' conduct caused the Class members to sustain damages; and

h. the extent of damages sustained by Class members and the appropriate measure of damages.

73. Plaintiff has and will continue to fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

74. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

***All Defendants Violated Section 10(b) of the Exchange Act and Rule 10b-5***

75. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

76. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other Class members to purchase Spectrum common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

77. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Spectrum securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

78. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of Spectrum as specified herein.

79. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

80. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal the true condition of the Consolidations and their impact on Spectrum from the investing public and to support the artificially inflated prices of the Company's securities.

81. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Spectrum's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Spectrum's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Spectrum's common stock during the Class Period at artificially high prices and were or will be damaged thereby.

82. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Spectrum securities. At the time of the

misrepresentations and omissions, Plaintiff and other Class members were ignorant of their falsity and believed them to be true. Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Spectrum securities had been artificially inflated by Defendants' fraudulent course of conduct.

83. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class members suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

84. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

85. The Individual Defendants have both primary liability, and controlling person liability, arising from the following facts: (i) the Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to information regarding and participated in the execution of the Consolidations, and the creation, development, and reporting of the Company's financial and operational condition; (iii) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances and operations at all relevant times; and (iv) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

86. This action was filed within two years of discovery of the fraud and within five years of each of Plaintiff's purchases of common stock giving rise to the cause of action.

87. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

**COUNT II**

***The Individual Defendants Violated Section 20(a) of the Exchange Act***

88. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

89. The Individual Defendants acted as controlling persons of Spectrum within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

90. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to

control or influence the Consolidations giving rise to the securities violations as alleged herein, and exercised the same.

91. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

92. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of common stock giving rise to the cause of action.

93. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

a. Determining that this action is a proper class action, and certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

b. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained because of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

d. Granting extraordinary equitable and/or injunctive relief as permitted by law; and

e. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a jury trial.

Dated: April 30, 2019

Respectfully submitted,

/s/ Douglas M. Poland
Douglas M. Poland
State Bar No. 1055189
Alison E. Stites
State Bar. No. 1104819
RATHJE WOODWARD LLC
10 East Doty St., Ste. 507
Madison, WI 53703
(608) 960-7430
dpoland@rathjewoodward.com
astites@rathjewoodward.com

*Liaison Counsel for Plaintiff West Palm Beach Firefighters' Pension Fund*

Avi Josefson
BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
875 North Michigan Avenue, Suite 3100
Chicago, Il 60611
Tel: (312) 373-3880
avi@blbglaw.com

Michael Blatchley
Edward G. Timlin
BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 554-1400
michaelb@blbglaw.com
edward.timlin@blbglaw.com

*Counsel for Plaintiff West Palm Beach Firefighters' Pension Fund*

Robert D. Klausner
Bonni S. Jensen
KLAUSNER KAUFMAN JENSEN & LEVINSON
7080 Northwest 4th Street
Plantation, FL 33317
(954) 916-1202
bob@robertdklausner.com
bonni@robertdklausner.com

*Additional counsel for Plaintiff West Palm Beach Firefighters' Pension Fund*