## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| JET CAPITAL MASTER FUND, L.P., | |
| Plaintiff, | No. 21-cv-552-jdp |
| v. | |
| HRG GROUP, INC. ET AL., | |
| Defendants. | |

**REVISED (PER ECF NO. 117) MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT ......................................................................................................... 6

  I.    THE COURT SHOULD APPROVE LEAD COUNSEL'S 22% FEE REQUEST, BECAUSE IT IS REASONABLE AND APPROPRIATE. ......................................... 6

    A.  A 22% Fee Award Is Consistent With Comparable Awards in this Circuit and Nationwide. .................................................................................................. 8

    B.  Lead Counsel Obtained an Excellent Result for the HRG Subclass in the Face of Acute Litigation Risks. .................................................................................. 10

      1.  Lead Counsel Took on Considerable Risk by Objecting to the Prior Settlement ........................................................................................... 11

      2.  The Objection to the Prior Settlement Was Successful, Allowed This Court to Appoint and Adequate Lead Plaintiff and Lead Counsel, Preserved the Claims of the HRG Class and Ultimately Improved the Recovery of the HRG Subclass. ............................................................... 11

      3.  Lead Counsel Faced Considerable Risk in Prosecuting the Claims of the HRG Subclass. ...................................................................................... 12

      4.  The Risk to Lead Counsel Increased Significantly When the *Spectrum* Action Settled and Defendants Pressed to Litigate the Standing Issue with the HRG Subclass. ................................................................................. 15

      5.  Notwithstanding Settlement of the Spectrum Subclass, Lead Counsel Negotiates a Settlement for the HRG Subclass Over 50% Better Than the Prior Settlement. ................................................................................. 17

    C.  Other Relevant Factors Justify Lead Counsel's Fee Request ...................................... 19

    D.  The Fee Request Is Also Reasonable Under the Lodestar Methodology .................. 21

  II.    THE COURT SHOULD APPROVE THE PAYMENT OF LEAD COUNSEL'S LITIGATION EXPENSES. ......................................................................... 22

CONCLUSION ..................................................................................................... 24

# TABLE OF AUTHORITIES

Page

## Cases

*Abbott v. Lockheed Martin Corp.*,
2015 WL 4398475 (S.D. Ill. July 17, 2015) ............................................................................ 22

*Americans for Prosperity v. Grewal*,
2021 WL 1153194 (D.N.J. Mar. 26, 2021) .............................................................................. 22

*Beesley v. International Paper Co.*,
2014 WL 375432 (S.D. Ill. Jan. 31, 2014) ........................................................................ 20, 22

*Brown v. Rita's Water Ice Franchise Co. LLC*,
242 F. Supp. 3d 356 (E.D. Pa. 2017) ..................................................................................... 22

*Chesemore v. Alliance Holdings Inc.*,
2014 WL 4415919 (W.D. Wis. Sept. 5, 2014) .......................................................................... 9

*City of Greenville v. Syngenta Crop Prot., Inc.*,
904 F. Supp. 2d 902 (S.D. Ill. 2012) ...................................................................................... 22

*Florin v. Nationsbank of Georgia, N.A.*,
34 F.3d 560 (7th Cir. 1994) ...................................................................................................... 7

*Florin* v. *Nationsbank of Georgia, N.A.*,
60 F.3d 1245 (7th Cir. 1995) ................................................................................................... 15

*Gaskill v. Gordon*,
160 F.3d 361 (7th Cir. 1998) .................................................................................................... 7

*Goesel v. Boley International (H.K.) Ltd.*,
806 F.3d 414 (7th Cir. 2015) .................................................................................................. 22

*Great Neck Capital Appreciation Inv. Partnership, L.P. v. PricewaterhouseCoopers*, *L.L.P.*,
212 F.R.D. 400 (E.D. Wis. 2002) ................................................................................. 7, 9, 14, 19

*Gupta v. Power Solutions International, Inc.*,
No. 16-cv-82533 (N.D. Ill. May 13, 2019) ............................................................................ 5, 9

*Hale v. State Farm Mutual Automobile Insurance Co.*,
2018 WL 6606079 (S.D. Ill. Dec. 16, 2018) ........................................................................ 8, 21

*Harman v. Lyphomed, Inc.*,
945 F.2d 969 (7th Cir. 1991) .................................................................................................. 21

*In re Akorn, Inc. Securities Litigation*,
2018 WL 2688877 (N.D. Ill. June 5, 2018) ............................................................................ 22

*In re Continental Illinois Securities Litigation*,
962 F.2d 566 (7th Cir. 1992) .................................................................................................... 8

*In re FedEx Ground Package System, Inc. Employment Practices Litigation*,
  2017 WL 1735528 (N.D. Ind. Apr. 28, 2017) ........................................................................ 9

*In re Lithiotripsy Antitrust Litigation*,
  2000 WL 765086 (N.D. Ill. June 12, 2000) ........................................................................ 10

*In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation*,
  2016 WL 11686450 (D.N.J. June 3, 2016) ........................................................................ 22

*In re Northfield Labs., Inc. Securities Litigation*,
  2012 WL 2458445 (N.D. Ill. June 26, 2012) ...................................................................... 22

*In re Synthroid Marketing Litigation*,
  264 F.3d 712 (7th Cir. 2001) ............................................................................................. 10

*McKinnie v. JP Morgan Chase Bank, N.A.*,
  678 F. Supp. 2d 806 (E.D. Wis. 2009) ................................................................................ 7

*Pearson v. NBTY, Inc.*,
  772 F.3d 778 (7th Cir. 2014) ............................................................................................. 12

*Purdy v. Security Savings & Loan Association*,
  727 F. Supp. 1266 (E.D. Wis. 1989) ................................................................................... 7

*Retsky Family Ltd. Partnership v. Price Waterhouse LLP*,
  2001 WL 1568856 (N.D. Ill. Dec. 10, 2001) ....................................................................... 9

*Reynolds v. Beneficial National Bank*,
  288 F.3d 277 (7th Cir. 2002) ............................................................................................. 12

*Silverman v. Motorola Solutions, Inc.*,
  739 F.3d 956 (7th Cir. 2013) ........................................................................................ 10, 12

*Silverman v. Motorola, Inc.*,
  2012 WL 1597388 (N.D. Ill. May 7, 2012) ........................................................................ 21

*Sutton v. Bernard*,
  504 F.3d 688 (7th Cir. 2007) ............................................................................................... 7

*Taubenfeld v. AON Corp.*,
  415 F.3d 597 (7th Cir. 2005) ..................................................................................... passim

*Van Noppen v. Innerworkings, Inc.*,
  No. 14-cv-1416 (N.D. Ill. Nov. 2, 2016) ......................................................................... 5, 9

*Williams v. Rohm & Haas Pension Plan*,
  658 F.3d 629 (7th Cir. 2011) ............................................................................................. 21

**Rule**

Federal Rule of Civil Procedure 23 ......................................................................................... 1

Rolnick Kramer Sadighi LLP as Lead Counsel for the HRG Subclass, respectfully submits this revised memorandum of law in support of its motion under Federal Rule of Civil Procedure 23(h) for an award of attorneys' fees and payment of Litigation Expenses in the above-captioned action (the "Action"). This memorandum was originally filed on February 7, 2022 (ECF No. 106) and pursuant to the Court's March 8, 2022 docket order (ECF No. 117), Lead Counsel now submits this revised memorandum.

## PRELIMINARY STATEMENT

This is a securities class action against Spectrum Brands, a consumer-goods company. HRG Group, Inc. ("HRG") was the controlling shareholder of Spectrum Brands Legacy, Inc. ("Old Spectrum"). During the relevant period, Old Spectrum merged into HRG, which was then renamed Spectrum Brand Holdings, Inc. ("Spectrum").

This case began with two securities class actions on behalf of Old Spectrum shareholders. The PSLRA notices in those cases were not directed to HRG shareholders, and did not mention HRG at all. Those two actions were consolidated as *In re Spectrum Brands Securities Litigation*, No. 19-cv-347-jdp (the "*Spectrum* Action"). The Public School Teachers' Pension and Retirement Fund of Chicago and the Cambridge Retirement System (together, the "Spectrum Subclass Lead Plaintiffs") successfully moved for appointment as lead plaintiffs in the *Spectrum* Action. Neither disclosed any trades in HRG stock in their application.

Yet when the Spectrum Subclass Lead Plaintiffs filed their consolidated complaint ("Complaint") in the *Spectrum* Action, it brought class claims on behalf of purchasers of Old Spectrum, Spectrum, *and HRG* stock. Defendants' Counsel contacted lead counsel in the *Spectrum* Action to request that they withdraw their claims on behalf of HRG investors. Lead counsel in the *Spectrum* Action refused to do so. Defendants then moved to dismiss, arguing, among other things, that the claims of HRG shareholders should be dismissed because lead counsel

were not authorized to represent the HRG stockholders, none of whom ever received the requisite PSLRA notice.[1]  Defendants also argued that the HRG Subclass lacked standing to bring their Exchange Act claims at all because they did not purchase shares of Old Spectrum or Spectrum.  In response, Spectrum Subclass Lead Plaintiffs opposed the motion to dismiss, did not withdraw their claims on behalf of HRG investors, and did not issue a revised notice for lead plaintiff to represent HRG investors.

While Defendants' motion to dismiss the *Spectrum* Action was pending (and before this Court decided that motion), the Spectrum Subclass Lead Plaintiffs reached a proposed settlement of all claims for $39 million (the "Prior Settlement").  The notice of that settlement was mailed to HRG stockholders.  This was the first time that HRG shareholders (including Lead Plaintiff Jet Capital) were notified that their claims against Defendants were part of an existing class action, and that those claims were now being compromised.  And buried in the notice was a statement that the Prior Settlement imposed a 75% discount for claims of HRG stock purchasers.  The claims of investors in Old Spectrum and Spectrum were not subject to any discount, and the Spectrum Subclass Lead Plaintiffs had substantially larger positions in Spectrum and Old Spectrum than they did in HRG.

Believing that the 75% discount for HRG shareholders was excessive and unfair, especially when proposed by the Spectrum Subclass Lead Plaintiffs, whose losses were almost all concentrated in Old Spectrum and Spectrum stock, not HRG stock, Lead Plaintiff Jet Capital Master Fund, L.P. ("Jet Capital"), along with two other institutional HRG investors represented

---

[1] Defendants are Spectrum, Old Spectrum, HRG and Individual Defendants Andreas R. Rouvé, David M. Maura, and Douglas L. Martin.

by Lead Counsel, objected to the Prior Settlement. To fully protect their rights, and the interests of all HRG investors, those HRG investors also moved to intervene in the *Spectrum* Action.

The Court refused to approve the Prior Settlement. The Court "agree[d] with Jet that plaintiffs didn't provide adequate notice to HRG stock purchasers" and stated that "[t]he case took a wrong turn when plaintiffs chose to amend their complaint without publishing a new notice or asking the court to approve an additional lead plaintiff to represent the HRG stock purchasers." (ECF No. 74 at 4, 7.) The Court also held that "the current lead plaintiffs aren't adequate representatives of HRG stock purchasers" and that the 75% discount was imposed by the Spectrum Subclass Lead Plaintiffs despite that they were not "adequate representative[s] for the adversely affected class members. (ECF No. 74 at 5, 7.) As to the standing of the HRG Subclass, the Court concluded that "[i]t is enough to say that neither the parties nor Jet have identified any controlling law on the question." (ECF No. 74 at 5.) The Court then offered the Spectrum Subclass Lead Plaintiffs the option of issuing a PSLRA notice to HRG stockholders and reopening the lead plaintiff process for HRG shareholders.

As a result of the objection, a lead-plaintiff-process for the HRG Subclass was initiated. Jet Capital successfully moved to be appointed lead plaintiff for the HRG Subclass. No other HRG shareholders, including the Spectrum Subclass Lead Plaintiff Public School Teachers' Pension and Retirement Fund of Chicago, who had purchased HRG shares, sought to be lead plaintiff.

Jet Capital, the Spectrum Subclass Lead Plaintiffs, and Defendants thereafter participated in a three-way formal mediation session on July 22, 2021 before Jed D. Melnick, Esq. of JAMS, a well-respected and highly experienced mediator of securities class actions. Despite vigorous settlement negotiations, this three-way mediation ended without any agreement among the parties. After the unsuccessful mediation session, Lead Counsel and Defendants' Counsel did not further

discuss resolving the claims of the HRG Subclass. But the same was apparently not true for the Spectrum Subclass Lead Plaintiffs. Rather, after the July 22 mediation session, and unbeknownst to Lead Counsel for the HRG Subclass, the Spectrum Subclass Lead Plaintiffs and Defendants continued settlement discussions through Mr. Melnick and in less than two weeks reached a settlement-in-principle. As a result of the Spectrum Subclass settlement, Defendants were able to resolve the vast majority of its litigation exposure. As a matter of strategy, this allowed Defendants to press their standing argument against the HRG Subclass before resuming any negotiations. In furtherance of that strategy, Defendants negotiated a motion-to-dismiss schedule with Lead Counsel. The settlement with the Spectrum Subclass was expected to (and did) place increased pressure on the HRG Subclass. By resolving the vast exposure to the Spectrum Subclass, the Defendants could test the standing defense—on which there was no controlling law and which presented an existential threat to the HRG Subclass' claims—with the HRG Subclass before returning to settlement discussions. Defendants made this preferred course known to the Court when asking that the cases by severed so that they could move to dismiss against the HRG Subclass. Of course, potential loss on the standing issue would mean that the HRG Subclass would receive nothing—an outcome even worse than the draconian 75% discount imposed pursuant to the Prior Settlement.

In order to protect the HRG Subclass, Lead Counsel, assisted by Mr. Melnick, expended enormous effort to convince Defendants to return to the bargaining table with the HRG Subclass before adjudication of any motion to dismiss. Lead Counsel was successful, and after nearly a month of contentious arm's-length, hard-fought negotiations, Jet Capital and Defendants agreed to a $7,250,000 cash settlement of the securities fraud claims asserted by the HRG Subclass in this Action. This settlement amount represents a 51% increase in recovery for HRG shareholders

versus the Prior Settlement that the Court rejected.    The Court preliminarily approved the Settlement and directed that notice of the Settlement be provided to the HRG Subclass.    (ECF No. 102.)

As detailed in the Revised Rolnick Declaration[2] and shown below, this Court should approve Lead Counsel's request for 22% of the Settlement Fund, net of Court-approved Litigation Expenses and estimated Notice and Administration Costs.    The 22% fee request is reasonable and appropriate:

***A 22% Fee Award Is Well Within the Range of Comparable Awards Approved in this Circuit and Nationwide.***    A 22% fee award is consistent with awards in similar securities class actions and other complex litigation both within the Seventh Circuit and around the country.    For example, in *Taubenfeld v. AON Corp.*, the Seventh Circuit held that the district court was within its discretion in awarding a 30% fee—36% higher than that sought by Lead Counsel here—for a $7.25 million securities class action settlement.    415 F.3d 597, 600 (7th Cir. 2005); *see also Gupta v. Power Solutions Int'l, Inc.*, No. 16-cv-8253, ECF No. 153 (N.D. Ill. May 13, 2019) (attorney fee award of one-third of $8.5 million settlement fund in securities class action that settled before motion to dismiss decided); *Van Noppen v. Innerworkings, Inc.*, No. 14-cv-1416, ECF No. 108 (N.D. Ill. Nov. 2, 2016) (attorney fee award of 30% of $6.025 million settlement fund in securities class action).    Moreover, a 22% fee is also in line with nationwide attorneys' fees in securities class action settlements.    The median percent of fees awarded in securities class action settlements

---

[2] The Revised Declaration of Lawrence M. Rolnick, filed herewith ("Revised Rolnick Declaration") is an integral part of this submission and Lead Counsel respectfully refers the Court to the Revised Rolnick Declaration for a detailed description of the topics discussed herein, including Lead Counsel's objection to the prior settlement, the prosecution and settlement of this Action, the HRG standing issue, and the risks of continued litigation, among other topics.

of similar amounts since 1996 is about 33.25%, an increase of more than 50% of Lead Counsel's 22% fee request.

***Lead Counsel Obtained an Excellent Result for the HRG Subclass in the Face of Acute Litigation Risks.*** At every turn, Lead Counsel faced exceedingly high risk, but delivered stellar results for the HRG Subclass on a fully contingent basis. Lead Counsel entered this litigation by objecting to the Prior Settlement on the basis of a punitive 75% discount imposed on HRG shareholders' claims after lack of proper PSLRA notice to HRG investors. The failure to comply with PSLRA notice prevented this Court from selecting a Lead Plaintiff and Lead Counsel that could fairly and adequately represent HRG shareholders. This Court then upheld the objection and likely saved the claims of the HRG Subclass. Lead Counsel then attempted to negotiate a favorable resolution for the HRG Subclass during the three-way mediation. After that was unsuccessful, the HRG Subclass was placed in an unenviable position when the Spectrum Subclass settled, empowering the Defendants to litigate, rather than settle, with the HRG Subclass and force the standing issue to the fore. Yet despite these strong headwinds, with persistent effort and the assistance of Mr. Melnick as mediator, Lead Counsel were able to convince Defendants to return to the negotiating table and ultimately agree on the Settlement, which delivers a 51% greater per-share recovery than the Prior Settlement and avoided adjudication of the standing issue.

In addition, Lead Counsel's request for $39,609.34 in Litigation Expenses is reasonable and should be approved.

## ARGUMENT

## I.  THE COURT SHOULD APPROVE LEAD COUNSEL'S 22% FEE REQUEST, BECAUSE IT IS REASONABLE AND APPROPRIATE.

It is well-settled that lead counsel in a securities class action are entitled to seek payment of attorneys' fees from the common fund created by a settlement. *See Sutton v. Bernard*, 504 F.3d

688, 691 (7th Cir. 2007) ("Once a settlement has been reached in a class action, the attorneys for the class petition the court for compensation from the settlement or common fund created for the class's benefit."); *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers*, L.L.P., 212 F.R.D. 400, 410 (E.D. Wis. 2002) ("Under th[e] [common fund] doctrine, when a case results in the creation of a common fund for the benefit of the plaintiff class, the plaintiffs' attorneys may petition the court to recover their fees out of the fund."); *Purdy v. Sec. Sav. & Loan Ass'n*, 727 F. Supp. 1266, 1268 (E.D. Wis. 1989) ("When a common fund is available, attorneys for the successful parties may petition for a portion of the fund as compensation for their efforts.").

The Seventh Circuit, as well as District Courts within this Circuit, have counseled in favor of using the percentage-of-recovery methodology, rather than the lodestar methodology, in determining an award of attorneys' fees from a common fund.  As one court explained, "[t]he Seventh Circuit recognizes that there are advantages to utilizing the percentage of fund method in common fund cases including its relative objectivity and the fact that it is easily administered." *Great Neck*, 212 F.R.D at 411; *see, e.g.*, *Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998) ("When a class suit produces a fund for the class, it is commonplace to award the lawyers for the class a percentage of the fund . . . ."); *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 566 (7th Cir. 1994) ("there are advantages to utilizing the percentage method in common fund cases because of its relative simplicity of administration").  In addition, awarding attorneys' fees "as a percentage of the common fund . . . most closely replicates the market for the legal services provided." *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 815 (E.D. Wis. 2009). Although the choice of methodology is within this Court's discretion, Lead Counsel respectfully submits that the Court should award Lead Counsel attorneys' fees based on a percentage of the Settlement fund.  *See Hale v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 6606079, at *7 (S.D. Ill.

Dec. 16, 2018) ("the percentage method is employed by the vast majority of courts in the Seventh Circuit (like other Circuits)") (internal quotation marks omitted).

Lead Counsel's fee request for 22% of the Settlement Fund, net of Court-approved Litigation Expenses and estimated Notice and Administration Costs, is reasonable and appropriate and well within the range typically approved in this Circuit.

**A. A 22% Fee Award Is Consistent With Comparable Awards in this Circuit and Nationwide.**

As the Seventh Circuit has long recognized, "[t]he object in awarding a reasonable attorney's fee . . . is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible." *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992). "[A]ttorneys' fees from analogous class action settlements are indicative of a rational relationship between the record . . . and the fees awarded by the district court." *Taubenfeld*, 415 F.3d at 600.

A 22% fee award is consistent with the fee awards in numerous settlements within this Circuit that have resulted in comparable recoveries. For example, in *Taubenfeld*, the Seventh Circuit held that the district court was within its discretion in awarding a 30% fee—36% higher than the fee sought by Lead Counsel here—for a $7.25 million securities class action settlement. 415 F.3d 597. In that case, "[l]ead counsel submitted a table of thirteen cases in the Northern District of Illinois where counsel was awarded fees amounting to 30-39% of the settlement fund." *Id.* at 600. Moreover, the court noted "that lead counsel was taking on a significant degree of risk of nonpayment with the case," especially given that "an SEC investigation essentially cleared Aon of any perceived wrongdoing," which "bolster[ed] the finding that this was not an 'easy' case for lead counsel." *Id.* The Seventh Circuit ultimately held that "[g]iven the legal hurdles that lead counsel faced in proving liability, the $7.5 million settlement obtained for the class at a relatively

8

early point in time . . . seems reasonable and bears a rational relationship to the amount of attorneys' fees awarded." *Id.*

Similarly, in *Great Neck*, the court approved a 30% fee for a $10.15 million securities class action settlement. 212 F.R.D. at 412. The court observed that the typical fee size had been described by other courts variously as "between twenty percent and thirty percent," "twenty-five percent from which the award may be adjusted upward or downward" and "closer to thirty percent." *Id.* The court found a fee in the 30% range to be appropriate given that "counsel achieved a good recovery for the class," "[c]ounsel [wa]s skilled in securities fraud class actions and used their expertise to the advantage of the class," "[t]he case presented a number of difficult issues and the risks of not prevailing were considerable," "[t]he litigation . . . was . . . socially beneficial because a securities fraud class action is a mechanism for holding corporations accountable for wrongdoing." *Id.* The court also concluded that "although the settlement was reached relatively early in the litigation (after [the] motion to dismiss had been denied), class counsel put in a substantial amount of work." *Id.*; *see also Chesemore v. Alliance Holdings Inc.*, 2014 WL 4415919, at *7 (W.D. Wis. Sept. 5, 2014) (attorney fee award of 25% of $4.5 million common fund); *Gupta v. Power Solutions Int'l, Inc.*, No. 16-cv-8253, ECF No. 153 (N.D. Ill. May 13, 2019) (attorney fee award of one-third of $8.5 million settlement fund in securities class action that settled before motion to dismiss decided); *Van Noppen v. Innerworkings, Inc.*, No. 14-cv-1416, ECF No. 108 (N.D. Ill. Nov. 2, 2016) (attorney fee award of 30% of $6.025 million settlement fund in securities class action); *Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, 2001 WL 1568856, at *4 (N.D. Ill. Dec. 10, 2001) ("one-third of the [$14 million] common fund" in securities class action settlement "constitutes a reasonable attorney's fee"); *In re FedEx Ground Package Sys., Inc. Employment Pracs. Litig.*, 2017 WL 1735528, at *8 (N.D. Ind. Apr. 28, 2017)

(attorney fee award of one-third of $3.2 million settlement fund); *In re Lithiotripsy Antitrust Litig.*, 2000 WL 765086 at *1, *2 (N.D. Ill. June 12, 2000) (attorney fee award of one-third of $1.3 million settlement fund).

A 22% fee is also in line with nationwide attorneys' fees in securities class action settlements. According to NERA, an economic consulting firm, the median percent of fees awarded in securities class action settlements between $5 million and $10 million was 32.8% from 2012 through 2021, and 33.7% from 1996 through 2011. Thus, Lead Counsel's 22% fee request here is about two thirds (2/3) of the median amount of fees awarded in all securities class action settlements of similar size.

## B. Lead Counsel Obtained an Excellent Result for the HRG Subclass in the Face of Acute Litigation Risks.

In addition to other fee-award benchmarks, the Court should consider the results obtained by Lead Counsel in the settlement, and the risks (including prosecuting this Action on a fully contingent basis) that Lead Counsel undertook in the Action and faced from continued litigation had settlement not been reached. *See Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) ("The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel."); *Taubenfeld*, 415 F.3d at 600 (court should "consider[] the quality of legal services rendered and the contingent nature of the case"); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 721 (7th Cir. 2001) ("The market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear" and "in part on the quality of its performance," among other factors).

By any measure, Lead Counsel's involvement in this case has been risky from the start, but has achieved enormous results.

1.  **Lead Counsel Took on Considerable Risk by Objecting to the Prior Settlement**

Lead Counsel first objected to the Prior Settlement in the *Spectrum* Action on behalf of Jet Capital and two other institutional HRG investors.  This objection argued that (i) the PSLRA notice issued by Bernstein Litowitz was defective as to HRG shareholders; (ii) the 75% discount in the Prior Settlement for HRG shareholders was unfair, arbitrary, and unjustified; and (iii) the discount unfairly benefited the Spectrum Subclass Lead Plaintiffs because they had a much larger stake in the Spectrum class than the HRG class and thus enjoyed a larger overall allocation as a result of the discount.  Objections to class actions settlements are rarely sustained.  Because Lead Counsel filed the objection on a contingency basis, it took on the risk that its efforts would yield no compensation at all.

2.  **The Objection to the Prior Settlement Was Successful, Allowed This Court to Appoint and Adequate Lead Plaintiff and Lead Counsel, Preserved the Claims of the HRG Class and Ultimately Improved the Recovery of the HRG Subclass.**

This Court properly sustained the objection to the Prior Settlement.  The Court "agree[d] with Jet that plaintiffs didn't provide adequate notice to HRG stock purchasers" and stated that "[t]he case took a wrong turn when plaintiffs chose to amend their complaint without publishing a new notice or asking the court to approve an additional lead plaintiff to represent the HRG stock purchasers." (ECF No. 74 at 4, 7.)  The Court also held that "the current lead plaintiffs aren't adequate representatives of HRG stock purchasers" and that the 75% discount was imposed by the Spectrum Subclass Lead Plaintiffs despite that they were not "adequate representative[s] for the adversely affected HRG class members.  (ECF No. 74 at 5, 7.)

The successful objection to the Prior Settlement thus preserved the claims of the HRG Subclass.  Had the objection not been filed, the Court would have been unable to approve the Prior Settlement with respect to the HRG Subclass, given its findings that the required PSLRA notice had not been provided to HRG shareholders and that the Spectrum Subclass Lead Plaintiffs could

not adequately represent those shareholders' interests. The successful objection allowed this Court to open the lead plaintiff process for the HRG Subclass, providing an opportunity for another HRG shareholder to take up the mantle from the Spectrum Subclass Lead Plaintiffs and litigate the case or negotiate a better settlement for the HRG Subclass than the Prior Settlement.

This success should be taken into account in evaluating Lead Counsel's fee request. The Seventh Circuit has recognized that "objectors play an essential role in judicial review of proposed settlements of class actions." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014) (Posner, J.). Meritorious objections, like the one here to the Prior Settlement, are "encouraged by permitting lawyers who contribute materially to the proceeding to obtain a fee." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 288 (7th Cir. 2002) (Posner, J.). Nor is it of any moment that the Court may have independently identified the PSLRA notice failure and the Spectrum Subclass Lead Plaintiffs' inadequacy to represent the HRG Subclass as reasons to reject the Prior Settlement as to the HRG Subclass, because "objectors must decide whether to object without knowing what objections may be moot because they have already occurred to the judge." *Id.*

### 3. Lead Counsel Faced Considerable Risk in Prosecuting the Claims of the HRG Subclass.

One of the objectors represented by Lead Counsel, Jet Capital, offered to act as Lead Plaintiff for the HRG Subclass and was approved to do so by this Court. No other HRG shareholder sought appointment as lead plaintiff of the HRG Subclass, including one of the Spectrum Subclass Lead Plaintiffs, which had purchased HRG shares. Indeed, the Spectrum Subclass Lead Plaintiffs and their counsel were well aware of the legal standing challenge to the HRG Subclass. *See Silverman*, 739 F.3d at 958 ("no other law firm was willing to serve as lead counsel. Lack of competition not only implies a higher fee but also suggests that most members

12

of the securities bar saw this litigation as too risky for their practices."). Lead Counsel then faced considerable risks in litigating the HRG Subclass on a fully contingent basis.

Notably, Defendants' motion to dismiss the Complaint had not been decided. As discussed below, Defendants intended to move against any complaint filed by the HRG Subclass and would have argued (as they did in their prior motion to dismiss in the *Spectrum* Action) that the HRG Subclass lacked standing to bring *any* claims, because they did not purchase Old Spectrum or Spectrum securities. While Jet Capital strongly believes that it and the other HRG Subclass Members have standing under the Exchange Act to bring their claims (*See* Revised Rolnick Decl. ¶ 115), the bottom line is that, as this Court has already recognized, there is "no controlling law" on this issue. (ECF No. 74 at 5.) Thus, there was a serious and acute risk that this Court would have ruled in Defendants' favor and dismissed the claims of the HRG Subclass without any recovery.

In addition to the threshold standing issue, Jet Capital faced numerous other significant risks to its claims. These risks are described in greater detail in the Revised Rolnick Declaration (¶¶ 48, 117-38) and in Section I.C.2 of Lead Counsel's Final Approval Brief, both of which are submitted herewith. Moreover, Defendants would likely contend that these risks had grown since the Prior Settlement, because of additional decisions that Defendants would contend favored their position on these issues. (*See* Revised Rolnick Declaration ¶¶ 125-27, 131.)

*First*, there was significant risk that Defendants' statements about the progress of Spectrum's consolidations would be found inactionable under the federal securities laws. For example, Defendants would have continued to argue that their statements about the consolidation-efforts progress, including the "transitory" nature of the consolidation issues, were not false. These

13

arguments, if adopted by the Court or later by the jury, might have made certain of Defendants' statements about the consolidations true, and, therefore, inactionable under the Exchange Act.

*Second*, there was significant risk that Defendants might have been found to have made the challenged statements without the scienter necessary to establish a claim under the federal securities laws. For example, Defendants would have continued to argue that Spectrum was making adequate progress in consolidating its distribution networks, and that Defendants were only made aware of any deeper issues directly before Defendants disclosed those issues to the market. Given this, Defendants would argue, the requisite scienter to support a securities fraud claim could not be established. Again, if these arguments were accepted by the Court or a jury, they might negate scienter, a required element of a Section 10(b) claim.

*Third*, even if liability were successfully established, Jet Capital would have still faced significant defenses advanced by Defendants to proving loss causation and damages. "Defendants would assert that the losses were due to market, industry and general economic conditions rather than wrongful conduct." *Great Neck*, 212 F.R.D. at 410. For example, Defendants would have argued that a significant portion of the declines in the stock prices of HRG and Spectrum on the corrective disclosure dates reflected investors' reaction to poor performance of Spectrum as a company, based on a number of factors entirely unrelated to the financial impact caused by issues related to the consolidations. Moreover, Defendants would have argued to cut-off the class in April 2018, based on the disclosure in that month of problems with the consolidations, which would preclude purchasers of HRG stock after that date from recovering any damages. If Defendants prevailed on these arguments, recoverable damages might be eliminated or significantly reduced.

In sum, Lead Counsel was never "assured of a paycheck." *Florin* v. *Nationsbank of Georgia, N.A.*, 60 F.3d 1245, 1247 (7th Cir. 1995). Indeed, even after Jet Capital was appointed Lead Plaintiff of the HRG Subclass, there were a multitude of outcomes that might result in complete loss.

### 4. The Risk to Lead Counsel Increased Significantly When the *Spectrum* Action Settled and Defendants Pressed to Litigate the Standing Issue with the HRG Subclass.

On June 28, 2021, Jet Capital, the Spectrum Subclass Lead Plaintiffs, and Defendants informed the Court that a mediation was scheduled for July 2021 before Mr. Melnick (who mediated the Prior Settlement) to try and resolve the claims of the Spectrum Subclass and the HRG Subclass in a three-way mediation session with Defendants (the "Three-Way Mediation"). In advance of the mediation session, Jet Capital, the Spectrum Subclass Lead Plaintiffs, and Defendants submitted written mediation statements addressing multiple issues, including liability and damages. Lead Counsel for the HRG Subclass wrote extensively on the so-called standing issue, including citing cases and law not identified by lead counsel in the *Spectrum* Action in opposition to the motion to dismiss.

At the Three-Way Mediation, on July 22, 2021, Lead Plaintiff Jet Capital's counsel, Spectrum Subclass Lead Plaintiffs' counsel, Defendants' counsel and representatives from Spectrum's directors' and officers' liability insurance carriers participated in a formal, all-day remote mediation session before Mr. Melnick. During that session, Lead Plaintiff Jet Capital's counsel, Spectrum Subclass Lead Plaintiffs' counsel, and Defendants' counsel made presentations to Mr. Melnick and discussed the merits of this Action, including liability and damages. Despite vigorous settlement negotiations, the Three-Way Mediation ended without any agreement among the Parties.

After the July 22 mediation session, Lead Counsel for the HRG Subclass did not have additional discussions with Defendants' Counsel about resolving the claims of the HRG Subclass. This was apparently not true of Bernstein Litowitz as Lead Counsel for the Spectrum Subclass Lead Plaintiffs. Rather, after the July 22 mediation session, and unbeknownst to Lead Counsel for the HRG Subclass, the Spectrum Subclass Lead Plaintiffs and Defendants continued settlement discussions through Mr. Melnick, which resulted less than two weeks later in an agreement on a settlement-in-principle.

Having resolved the large exposure represented by the Spectrum Subclass, Defendants pressed to litigate a motion to dismiss, including the standing issue, against the HRG Subclass. On August 4, 2021, the Spectrum Subclass Lead Plaintiffs and Defendants informed the Court of their settlement-in-principle of the Spectrum Subclass, and requested that the Spectrum Subclass proceed on an entirely separate track from the HRG Subclass. The August 4 update also presented the Court with a proposed schedule for further litigation of the HRG Subclass, including for Lead Plaintiff to file an amended complaint and for Defendants to move to dismiss. On August 6, 2021, the Court issued an order to show cause why the Spectrum Subclass and the HRG Subclass should not be severed "so that each subclass can be resolved separately." The Court's order stated that "Defendants and lead counsel for the Spectrum subclass ask that the two subclasses 'proceed on completely separate tracks' because defendants plan to file a motion to dismiss the claims of the HRG subclass." (ECF No. 89.)

Lead Counsel recognized that litigation of the standing issue might result in dismissal of the HRG Subclass claims and thus result in no recovery—an outcome even worse than the punitive 75% discount imposed in the Prior Settlement. In order to determine whether such a risk could be avoided, Lead Counsel persisted in attempting to engage Defendants—with the assistance of

16

Mr. Melnick—in settlement discussions.  However, Mr. Melnick informed Lead Counsel that Defendants had little interest in settlement discussions with the HRG Subclass, and consistent with the representations made to the Court on August 3 and August 6, 2021, intended to litigate a motion to dismiss with the HRG Subclass that would resolve the "standing" issue.  (Melnick Decl. ¶ 13.)

The Defendants' strategy to settle with the Spectrum Subclass was intended to (and did) put increased pressure on the HRG Subclass.  By resolving the vast exposure to the Subclass, the Defendants could test the standing defense with the HRG Subclass before returning to settlement discussions.  Defendants made no effort to hide this strategy and expressed their intention to litigate the motion to dismiss with the HRG Subclass before resuming settlement discussions.  This strategy presented a clear risk to the HRG Subclass because it meant that Lead Counsel and the HRG Subclass had to take the chance of forfeiting any recovery—an outcome even worse than the 75% discount imposed through the Prior Settlement.

### 5. Notwithstanding Settlement of the Spectrum Subclass, Lead Counsel Negotiates a Settlement for the HRG Subclass Over 50% Better Than the Prior Settlement.

Yet despite the situation, Lead Counsel, through contentious and hard-fought negotiations that stretched nearly a month and with the assistance of Mr. Melnick as mediator, was able to achieve a $7.25 million cash settlement for the HRG Subclass.  Specifically, in an effort to protect the HRG Subclass from potentially losing any chance at recovery by litigating Defendants' motion to dismiss (including the standing issue), Lead Counsel and Mr. Melnick spent enormous effort trying to convince the Defendants to return to the settlement table.  After weeks of discussions, difficult settlement negotiations resumed between Lead Counsel and Defendants' Counsel about resolving the claims of the HRG Subclass, with Mr. Melnick serving as mediator in those discussions.

These discussions were professional, but contentious and hard-fought. In particular, during these discussions, Defendants made clear to Lead Counsel that they preferred to litigate the motion to dismiss, and having settled with the Spectrum Subclass, had the ability to do so before settling the claims of the HRG Subclass. After about a month of discussions, the parties had exchanged numerous bids and asks but were still far apart. To close the gap, Mr. Melnick issued a mediator's recommendation that the Action be resolved in exchange for a payment of $7.25 million. Recognizing that the $7.25 million payment was an increase of more than 50% over what the HRG class members would have received in the Prior Settlement—with the added benefit of avoiding adjudication of the potentially case-ending standing defense—Lead Counsel accepted the recommendation. On September 3, 2021, Mr. Melnick informed the Parties that both sides had accepted the mediator's proposal.

The Prior Settlement would have provided HRG Subclass Members an estimated recovery of just 33 cents per HRG share. The proposed Settlement will provide HRG Subclass Members an estimated recovery of 50 cents per HRG share. This represents a ***51% increase in recovery*** for HRG Subclass Members versus the Prior Settlement. This improvement in recovery occurred even as the litigation risks for the HRG Subclass *increased* following the proposed settlement of the *Spectrum* Action. The settlement of the Spectrum Action allowed Defendants to resolve most of their exposure and test their standing defense against the HRG Subclass before continuing any settlement discussions. Moreover, with the *Spectrum* Action settled, Defendants would have been able to devote all of their resources towards defending this Action.

Jet Capital's damages expert estimates that the Prior Settlement represented a recovery of 3.3% of the realistic maximum recoverable damages for the HRG Subclass. This proposed Settlement represents an approximate 5% recovery of the realistic maximum damages for the HRG

Subclass.  This is a ***51% increase in recovery from the Prior Settlement*** and an excellent result for the HRG Subclass, given the risks of litigation—including the unique risks faced by the HRG Subclass that Old Spectrum and Spectrum stock purchasers did not face.  In fact, according to NERA, the median settlement value of securities cases with $100 million to $200 million of investor losses—here, Jet Capital's damages expert estimates that the HRG Subclass lost approximately $145 million—from 2012 through 2021 was 2.8% of investor losses.  Thus, the Settlement provides a recovery for HRG Subclass Members of more than twice the median recovery over the last ten years, despite the unique and acute risks faced to the claims of the HRG Subclass.

The Settlement is an excellent result for the HRG Subclass in the face of risky litigation prospects and fully justifies Lead Counsel's 22% fee request.  *See Taubenfeld*, 415 F.3d at 600 ("evidence of the quality of legal services rendered" relevant to fee award); *Great Neck*, 212 F.R.D. at 412 (considering that "counsel achieved a good recovery for the class" and "used their expertise to the advantage of the class").

### C.  Other Relevant Factors Justify Lead Counsel's Fee Request

*Lead Counsel's Efforts*.  Lead Counsel expended considerable efforts in defending the interests of the HRG Subclass, working a total of nearly 700 hours on this litigation (including objecting to the Prior Settlement).  Those litigation efforts in the *Spectrum* Action and this Action included (i) analyzing the notice of a prior settlement of the HRG Subclass' claims to determine that those claims were being punitively discounted; (ii) objecting to the prior settlement on that basis; (iii) seeking to intervene on that basis; (iv) applying to serve as, and being appointed, Lead Plaintiff of the HRG Subclass; (v) litigating the case prior to settlement discussions and after a formal mediation session was unsuccessful; (v) consulting with economic advisors regarding loss-causation and damages issues presented by this Action, and the HRG Subclass' claims in

particular; (vi) participating in and preparing for the Three-Way Mediation; and (vii) after the failure of the Three-Way Mediation and the resolution of the Spectrum Action, persistently and successfully negotiating a settlement for the HRG Subclass that provides for a 51% increase in recovery versus the Prior Settlement (despite the increased pressure created after the Spectrum Subclass Lead Plaintiffs settled the *Spectrum* Action and in the face of Defendants' preferred strategy to litigate the motion to dismiss against the HRG Subclass).

*The Stakes of the Action Were High.*  From the vantage point of the HRG Subclass, the stakes could not have been higher.  Given the Court's ruling that HRG shareholders should have received a PSLRA notice of the *Spectrum* Action and that the Spectrum Subclass Lead Plaintiffs could not adequately represent HRG shareholders, had Lead Counsel not lodged an objection to the Prior Settlement, it is likely that the Court might not have approved that settlement as to the HRG Subclass.  The HRG Subclass suffered approximately $145 million in damages from Defendants' fraud, which represents significant financial damages to thousands of HRG shareholders.  The only way most of these shareholders could possibly receive relief was if Lead Counsel was successful in this Action.

*Approval of Lead Plaintiff and Reaction from the HRG Subclass to Date Support the Requested Fee.*  Lead Plaintiff Jet Capital approves of the 22% fee sought by Lead Counsel.  There were no objections to the 22% fee amount, and no valid exclusion requests.

*Quality of Opposing Counsel.*  The quality of opposing counsel is also important in evaluating the value of the work performed by Lead Counsel.  *See Beesley v. Int'l Paper Co.*, 2014 WL 375432, at *2 (S.D. Ill. Jan. 31, 2014) ("Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination.").  Here, Lead Counsel was opposed by very skilled and highly respected lawyers

with well-deserved reputations for vigorous advocacy in the defense of complex class actions such as this one. (*See* Rolnick Decl. ¶ 180.) In the face of this formidable opposition, Lead Counsel was nonetheless able to settle the Action on terms favorable to the HRG Subclass.

### D. The Fee Request Is Also Reasonable Under the Lodestar Methodology

The Seventh Circuit does not require this Court to cross-check the award of a fee on a percentage-of-recovery basis using the lodestar methodology. *See Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) ("consideration of a lodestar check is not an issue of required methodology"); *Silverman v. Motorola, Inc.,* 2012 WL 1597388, at *4 (N.D. Ill. May 7, 2012) ("It is unnecessary to resort to a lodestar calculation to reinforce the . . . conclusion" that fees awarded based on percentage of recovery method are reasonable), *aff'd,* 739 F.3d 956. Nevertheless, a lodestar cross-check confirms that Lead Counsel's fee request is reasonable.

As noted above, Lead Counsel spent 692.4 hours of attorney and other professional support time prosecuting this Action (including the work in objecting to the Prior Settlement).[3] Based on Lead Counsel's hourly rates, the total lodestar is $649,243.50. The requested 22% fee, which would amount to approximately $1,509,236 (before interest), represents a multiplier of approximately 2.32 of Lead Counsel's total lodestar. This multiplier is within the range of multipliers awarded in this Circuit in securities class actions and other comparable litigation. A 2.32 multiplier is reasonable in this case, given Lead Counsel's considerable success and efforts in the face of the marked risks to the HRG Subclass claims detailed above. *See Harman v. Lyphomed, Inc.*, 945 F.2d 969, 976 (7th Cir. 1991) ("Multipliers anywhere between 1.0 and 4.0 have been approved."); *Hale*, 2018 WL 6606079, at *14 (finding a multiplier of 2.83 reasonable).

---

[3] Further details on the amount of attorney time that Lead Counsel devoted to this matter is contained in Paragraphs 170 through 185 of the Revised Rolnick Declaration. Complete time entry narratives are attached as Exhibit 2 to the Revised Rolnick Declaration.

## II. THE COURT SHOULD APPROVE THE PAYMENT OF LEAD COUNSEL'S LITIGATION EXPENSES.

Lead Counsel also seeks payment of $39,609.34 in Litigation Expenses it has incurred through February 1, 2022. *See Beesley*, 2014 WL 375432, at *3 ("It is well established that counsel who create a common fund like this one are entitled to the reimbursement of litigation costs and expenses, which includes such things as expert witness costs . . . and mediation.") These expenses are summarized in the Revised Rolnick Declaration and are for: (i) Wisconsin counsel fees;[4] (ii) expert fees for analysis of the damages in this Action, in particular as to the HRG Subclass;[5] and (iii) mediation fees.[6] All of these Litigation Expenses were reasonable and necessary to the protection of the interests of the HRG Subclass and the successful litigation of the Action.

---

[4] *See In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 2016 WL 11686450, at *14 (D.N.J. June 3, 2016) (approving reasonable award of "$713,228" for "Specialized and Local Counsel"); *Americans for Prosperity v. Grewal*, 2021 WL 1153194, at *15 (D.N.J. Mar. 26, 2021) (awarding local counsel fees as expenses in civil rights lawsuit; "the fees and expenses for Marino Tortorella were incurred as an actual expense paid by Quinn Emanuel, which the Court assumes would not pay for legal services it did not consider as reasonable and necessary"); *Brown v. Rita's Water Ice Franchise Co. LLC*, 242 F. Supp. 3d 356, 371 (E.D. Pa. 2017) (granting reasonable "local counsel fees" as expenses in Telephone Consumer Protection Act class action).

[5] *See In re Northfield Labs., Inc. Sec. Litig.*, 2012 WL 2458445, at *4 (N.D. Ill. June 26, 2012) (awarding reasonable expenses for "damages consultant," "statistical consultant," "FDA consultant," and "expert witness"); *City of Greenville v. Syngenta Crop Prot., Inc.*, 904 F. Supp. 2d 902, 910 (S.D. Ill. 2012) (reimbursing reasonable "experts' fees" and "other consulting fees" as litigation expenses) (environmental class action).

[6] *See In re Akorn, Inc. Sec. Litig.*, 2018 WL 2688877, at *4 (N.D. Ill. June 5, 2018) (awarding reasonable expenses for mediation); *Northfield Labs*, 2012 WL 2458445, at *4 (awarding reasonable expenses for "mediation fees").

Lead Counsel's original Fee and Expense Application sought reimbursement for $225.34 in delivery, duplication and mailing fees. Although these expenses are compensable, *see Abbott v. Lockheed Martin Corp.*, 2015 WL 4398475, at *4 (S.D. Ill. July 17, 2015); *Northfield Labs*, 2012 WL 2458445, at *4, *City of Greenville*, 904 F. Supp. 2d at 910, because they arguably should be included in a law firm's overhead costs (given technological advances), out of an abundance of caution, Lead Counsel no longer seeks reimbursement for these costs. *Cf. Goesel v. Boley Int'l (H.K.) Ltd.*, 806 F.3d 414, 425 (7th Cir. 2015) ("[W]e leave for another day the question whether, decades into the digital age, there remains any logical rationale for treating computerized legal research as a novel indulgence.").

The Notice informed potential HRG Subclass Members that Lead Counsel would seek payment of Litigation Expenses in an amount not to exceed $500,000. The total amount requested, $39,609.34, is significantly below the $500,000 that HRG Subclass Members were notified could be sought. No HRG Subclass Member objected to the maximum amount of expenses disclosed in the Notice. Lead Counsel respectfully submits that its Litigation Expenses should be paid in full from the Settlement Fund.

**CONCLUSION**

For the foregoing reasons, Lead Counsel respectfully requests that the Court approve its requests for (i) a fee award of 22% of the Settlement Fund (net of Court-approved Litigation Expenses and estimated Notice and Administration Costs); and (ii) reimbursement from the Settlement Fund of $39,609.34 in reasonable and necessary Litigation Expenses.

Dated: March 9, 2022

Respectfully submitted,

**ROLNICK KRAMER SADIGHI LLP**

*/s/ Lawrence M. Rolnick*
Lawrence M. Rolnick (admitted pro hac vice)
Marc B. Kramer (admitted pro hac vice)
Matthew Peller
1251 Avenue of the Americas
New York, New York 10020
Tel. 212-597-2800

*Counsel for Jet Capital Master Fund, L.P. and the HRG Subclass*